Miller *v.* Lycoming Manufacturing Company et al., Appellants.

Argued May 5, 1939.

Before Keller, P. J., Cun-
ningham, Baldrige, Stadtfeld, Parker, Rhodes and
Hirt, JJ.

*C. Donald Swartz,* of *Swartz, Campbell & Henry,
John L. Cupp* with him *Herbert A. Barton,* for appel-
lants.

*Arthur C. Dale,* for appellee.

Opinion by Parker, J., June 26, 1939:

There is only one question involved in the appeal
in this workmen's compensation case and that is whether
the claimant has sustained the burden resting on him
to show that the loss of the industrial use of his left eye
was due to an "accident" as that word is used in the
statute giving compensation to employees who are in-
jured in the course of their employment. The referee
and board found that there was such an accident and
on appeal to a common pleas court the award was sus-
tained and judgment was entered for the claimant. We

are of the opinion that the judgment cannot be sustained.

We call attention at the outset to the fact that all the evidence produced came from the claimant and witnesses called by him, no testimony having been offered by defendants. There is little, if any, dispute as to the fundamental events upon which claimant depends in the first instance. However, the claimant's evidence showed clearly that expert testimony of specialists in diseases of and treatment of injuries to the eye was necessary in order to draw the proper inferences from those actual occurrences or to properly interpret them.

The claimant, Benjamin F. Miller, testified that he had been employed by the Lycoming Manufacturing Company for seventeen years. His task was to break scrap, weigh pig iron and oversee the charging of the furnaces. On July 30, 1936 at about 10 a. m. he was breaking scrap iron with a fifteen pound sledge and was doing the same type of work he "had been doing for an average of two hours a day during this period of 17 years." He was provided with and was wearing goggles for the protection of his eyes. He thus describes what then occurred: "Well I was breaking in the boiler section, and all at once something come over my eyes, and I wasn't hitting where I was looking, and I thought my goggles was dirty and I cleaned them and it wasn't any better, and I reported to Mr. Fargus and I claimed it was the goggles and asked for a different pair of goggles, I believed it was, and they got me a pair of goggles to wear and I tried them and it didn't remedy it at all."

Now, the claimant admits that there was no direct blow on the eye, that is, that no foreign substance came in contact with the eye. The claimant continued to work under a handicap as to his eyesight until August 13 or 14, but on August 6th was taken to an eye specialist who determined that his affliction was due to a detached retina. There was evidence from which the

board or referee might find that prior to July 30, 1936, the claimant enjoyed normal vision and good health. Several of the experts gave testimony from which they might likewise conclude that the detachment of the retina in so far as it directly affected vision was caused by one of the very blows that claimant struck on July 30, 1936, as described in his testimony. It does not follow as a necessary conclusion that the claimant has suffered a compensable injury for there are other matters in evidence that must be taken into account and those additional proofs were furnished by the claimant through the experts called by him.

The proper understanding and interpretation of that expert testimony furnishes the answer to the problem presented. "Detached retina, or its separation from the choroid, the membrane which supports it, may be brought about either by disease or by trauma or it may occur spontaneously. The final result of this condition is permanent loss of vision in the area of detached retina:" Reed and Emerson on The Relation Between Injury and Disease. While that is the language of a text book, it fairly summarizes the testimony of the claimant's experts in that respect. Dr. Baier examined the eye of the claimant about six days after the accident and found that the upper four-fifths of the retina, which he described as the photographic plate of the eye, was detached and the detachment at that time had proceeded so far that vision was practically destroyed. While he testified that in his opinion a blow struck with the hammer caused the final separation which reached a point where it was manifest by loss of sight, it occurred only by reason of a pre-existing weakness. He explained that the final effect might come from jumping from a wall and landing with a hard shock or riding over a railroad track in an automobile. We then quote from his testimony: "Q. Momentarily? A. Yes, but with the background, the thing was already loose in the small area, just tore away the remaining

portion. Q. Well, would a series of concussions result finally in the separation; could that happen too; that question was really asked? A. Yes, I would think it is possible. Q. So then it could happen in this case from the series of concussions over a period of years using that same hammer, or from, or momentarily from that one blow that hit down their resistance for some reason or other? A. Yes, but my feeling is, and that of the vast majority of authorities on these things is, that there has got to be something in the background to start this thing, there must be some reason for it, ordinarily. In that case practically everybody does [doing] that work would be subject to that thing, and they aren't. Q. There is some weakness develops? A. For some reason. A weakness ...... Q. Before the climax comes? A. Yes, before the end result occurs ...... Q. Doctor, is it your opinion there was some weakness of the left eye present before July 30th? A. Never having seen the man's eye or the patient himself before, I can't answer. Q. Doctor, with this history of a man using a 15 pound sledge hammer in the same class of work he had been doing for some 18 or 19 years, with that history would you say in your opinion there was some weakness in that eye that would cause that retina to suddenly give way on July 30, 1936? A. You mean as a consequence of this type of work? Q. Or the type of work, the fact he had been doing it all these years; the fact it was nothing unusual to him at all, wouldn't that lead you to the conclusion there was some inherent weakness in that eye, or was some inherent weakness in that eye prior to July 30th? A. Yes, I think so. Q. So that if your opinion in that respect is correct then, this detachment of the retina might have come at any time with the slightest jarring, such as going up and down stairs, and riding in an automobile across a bumpy road or something of that sort? A. Yes, I would think sufficient concussion would cause it at almost any time ...... Q. Have you ever

known of a case of detachment of the retina caused indirectly by trauma where there was no predisposing factor existing prior to that? A. No, I haven't."

Dr. Decker, the second expert called, saw the claimant three or four days later. He explained that one might have a part of the retina detached and not be aware of it and that until the portion opposite the center of the eye is detached or a detached portion falls over the center the sight is not affected. He further stated that from the history given and his own examination he could not reach a conclusion as to the cause of the detachment and that retinal detachment by indirect trauma was "very rare" unless the patient had a systemic organic disease which would make a detachment possible even when lying in bed. In that case it would be a gradual development.

Dr. Bastian did not see the patient until September 26, 1937. While he testified that in his opinion the ultimate condition of the retina as found by Dr. Baier was immediately precipitated by striking the heavy blow as claimed by Miller, he also said: "Q. In other words, that might have occurred had he been walking up the stairs or jolting himself in riding in an automobile over a rough street, or in any other such fashion. A. Yes, I do. Q. In other words, it was a progressive condition that had simply continued to get worse without his knowledge up to the point where the retina became detached to such extent he was conscious of it? A. Yes."

Dr. Foster examined the claimant's eye in November, 1937, but did not make a general physical examination of the claimant. He testified: "A. My professional opinion the detached retina was due to traumatism which happened on the date in which he states, and at the time he lost his vision. ...... A. I would say it was instantaneous ...... Q. Of course you don't know whether there was any predisposing cause such as a prior diseased condition of the eye existing prior to

July 30th, or not, do you? A. I do not. Q. When you say you believed that trauma caused this condition, you mean that it produced a sufficient detachment of the retina at that time to put the claimant on knowledge there was something wrong with his eye? A. I do. Q. And that is as far as your testimony goes, is that so? A. Yes."

Viewing the testimony in a light most favorable to the claimant it was sufficient to sustain a finding that the effect of the blow struck on the scrap at the time claimed indirectly transmitted through the body of the claimant caused the final detachment which resulted in the loss of the industrial use of the eye. At the same time the claimant proved that indirect trauma will not cause a detachment of the retina unless there is a predisposing condition and when such condition exists the detachment may be advanced by any movement which transmits force through the body to the eye. With the predisposing condition the final disaster might occur while riding in an automobile over a rough road or even while lying in bed. Direct trauma may cause a detachment without any predisposing condition, but there was no evidence of direct trauma and it is not even suggested that there was a direct blow to the eye or contact of foreign substance with it.

Such being the evidence, it follows that the injury was not due to an accident as defined by the statute. The leading cases on the subject in this state are *Gausman v. Pearson Co.*, 284 Pa. 348, 131 A. 247, and *Lacey v. Washburn & Williams Co.*, 309 Pa. 574, 164 A. 724. In the Gausman case the Supreme Court said: (p. 354) "Disability, overtaking an employee at his work, is not compensable unless the result of accident. And the burden is on claimant to prove it was such and not from natural causes. ...... True, Dr. Frederick attributed the exhaustion, or stroke, to claimant's exertion in the performance of his work and expressed the opinion that but for the work it would not have hap-

pened at that time; in other words that the disability was hastened by the work; even so, that alone would not constitute an accident; otherwise it would be unsafe to give employment to anyone advanced in years. Disability, hastened by such exercise, cannot be treated as accidental; neither can death or disability overtaking an employee in the course of his employment and resulting from a natural cause; if it could, it would render the employer an insurer of the life and health of the employee."

The most satisfactory discussion of the meaning of the word "accident" as used in the compensation law is contained in the Lacey case. After the decision in the last mentioned case, we had occasion to consider the application of those decisions to situations where the employee was engaged in strenuous physical labor and such exertion resulted in death in *McFadden v. Lehigh Nav. Coal Co.*, 111 Pa. Superior Ct. 501, 170 A. 314 and in *Rocco v. Ellsworth Collieries Co.*, 111 Pa. Superior Ct. 508, 170 A. 316. In the McFadden case we said: (p. 507) "Our conclusion is that where an employee while in the course of his employment, is performing hard labor, but of the same kind and in the same manner as he had been doing it for several years, and while so engaged is stricken with apoplexy and dies suddenly from a cerebral hemorrhage, the performance of such hard labor is not of itself over-exertion as that word is used in our cases, and is not an accident as that term is used in the Workmen's Compensation Law." In the Rocco case our conclusion was: (p. 513) "Even though a physician attributed a stroke to claimant's exertion in the performance of his work and expressed the opinion that but for the work it would not have happened at that time, nevertheless that alone would not constitute an accident. In any event the expert opinion of the physician was not material until there was some evidence of an accident. Over-exertion must be given a more limited meaning and must, in

any event, be confined to such cases as furnish the basis for a conclusion that there has been 'an unforeseen or fortuitous event.' " Also see *Pelusi v. Mandes,* 109 Pa. Superior Ct. 439, 167 A. 456; *Swiderski v. Glen Alden Coal Co.,* 114 Pa. Superior Ct. 21, 173 A. 865; *Whitecavage v. P. & R. C. & I. Co.,* 116 Pa. Superior Ct. 540, 176 A. 757; *Amentlar v. New Upper Lehigh C. Co.,* 131 Pa. Superior Ct. 97, 198 A. 678.

In the recent case of *Adamchick v. Wyoming Val. C. Co.,* 332 Pa. 401, 410, 3 A. 2d 377, the language of the Supreme Court is to the point: "An accident cannot be inferred merely from an injury. There must be some evidence of an accident, either direct or circumstantial, in the latter instance clearly and logically indicating it. In this case, there was none. Nor can an injury be inferred simply because there was an accident. There must be proof that the injury resulted from an accident." To the same effect is *Harring v. Glen Alden Coal Co.,* 332 Pa. 410, 415, 3 A. 2d 381.

Now, it will be observed that the Supreme Court said that an accident cannot be inferred *merely* from an injury, for there are situations where an accident may be inferred from the peculiar nature of the injury and the circumstances under which it is incurred. Assume that this claimant had been without physical impairment and had been engaged in breaking scrap when he suddenly discovered that he had broken a bone in his arm, for just such breaks have occurred. One would have no hesitation in saying that he had an accident even though the injured party or the experts could not describe just what had caused the injury. In such case, we would not infer the accident merely from the injury, but knowing that thousands of blows might be struck without breaking a bone, we would draw the reasonable and logical inference that in the mechanical operation of the arm and muscles or from similar cause the blow was delivered in such a way as to have placed an unusual strain on the bone and to such an extent that it

gave way. We had parallel situations in *Betts v. American Stores Co.,* 105 Pa. Superior Ct. 452, 161 A. 589; *Keck v. John Mullen Const. Co.,* 113 Pa. Superior Ct. 564, 173 A. 863; *Cowell v. F. W. Woolworth Co.,* 119 Pa. Superior Ct. 185, 180 A. 752; *Rice v. Stevens Coal Co.,* 120 Pa. Superior Ct. 15, 181 A. 516; *Reffner v. Consolidation Coal Co.,* 121 Pa. Superior Ct. 11, 182 A. 762; *Vitanza v. Iron City Prod. Co.,* 131 Pa. Superior Ct. 441, 200 A. 311.

In the cases last cited we did not infer the accident *merely* from the injury but we did infer from the peculiar nature and circumstances of the injury that there must have been some unusual violence to the structure of the body, a fortuitous happening or untoward event which was not expected or designed. Not only did the claimant fail to prove any such unusual occurrence or events from which an accident could be inferred, but his evidence tended to show that there was not such an occurrence. It is true that no one saw the beginning of the detachment prior to July 30, 1936, but from the nature and circumstances of the injury in the light of the expert advice furnished by claimant, the only reasonable inference is that there was a pre-existing partial detachment and the final injury came from the natural development of the detachment. It will be remembered that the uncontradicted evidence of claimant's experts was to the effect that the retina must have been already loose. It was not accelerated by an accident but by the doing of normal acts just such as the claimant had been performing for many years.

It will be observed that the facts in this case place it in the class where the injured person at the time is suffering from a progressive disease or physical weakness related to the injury and the case is to be distinguished from those where there is no existing impairment, physical or functional. Not only has the claimant failed to prove an accident, but he has affirmatively shown that his injury is the natural culmina-

568

tion of a progressive weakness in the eye. He failed to support the burden of proof resting on him.

The judgment is reversed and judgment is now entered for the defendants.