## Good v. Pennsylvania Department of Property and Supplies et al., Appellants.

188

Argued March 10, 1942.

Before KELLER, P. J., BALDRIGE, STADTFELD, RHODES, HIRT and KENWORTHEY, JJ.

*S. H. Torchia*, with him *Ralph H. Behney* and *Claude T. Reno*, Attorney General, for appellants.

*Maurice Yoffee*, with him *Caldwell, Fox & Stoner*, for appellee.

OPINION BY STADTFELD, J., July 27, 1942:

This is an appeal by the State Workmen's Insurance Fund from the decree of the Court of Common Pleas of Dauphin County affirming an award of compensation to the claimant made by the Workmen's Compensation Board on the theory that claimant's husband died as the result of an accident sustained while in the course of his employment with the Pennsylvania Department of Property and Supplies. HARGEST, P. J. delivered the opinion.

On December 29, 1937, and for sometime prior thereto, F. E. Good was employed by the Pennsylvania Department of Property & Supplies as a pipe fitter. He died on January 4, 1938, as the result of coronary occlusion with myocardial infarct. The claimant, widow of deceased, filed a claim petition alleging that her husband's death was the result of an accident sustained on December 29, 1937, while in the act of lifting a bucket of pipe fittings weighing anywhere from 60 to 100 pounds. Defendant insurance carrier filed an answer, denying that the death of deceased resulted from an accident sustained while in the course of his employment, and, after a hearing, the referee, on November 30, 1938, found as a fact that deceased's death was not the result of an accident and disallowed compensation.

On appeal to the Workmen's Compensation Board, that tribunal, after considering the lay and medical testimony, expressed a doubt as to whether the deceased had suffered an accident by way of overexertion and remanded the record for taking of further testimony, to determine whether the claimant's husband was performing his ordinary duties at the time he was stricken ill, and for further testimony if the parties so desired.

The case was then remanded to the referee, and, after taking additional testimony, the referee, on September 30, 1940, again disallowed compensation. The claimant again appealed to the board, and on February 20, 1941, the board sustained claimant's appeal and ordered

the payment of compensation to the widow for 300 weeks, at the rate of $10 per week. The board found as a fact that, while deceased may have, on occasions, performed the same act, before December 29, 1937, the exertion in getting the heavy load to his shoulder on this day, in view of its untoward result, constituted the accident. On appeal to the court below, the award was affirmed. This appeal followed.

The only question before this court is whether claimant's husband sustained an "accident" as that term is used in the Workmen's Compensation Act of June 2, 1915, P. L. 736, as amended. The burden of so proving is on the claimant. *Seitzinger v. Fort Pitt Brewing Co.,* 294 Pa. 253, 144 A. 79.

In *Mauchline v. State Insurance Fund et al.,* 279 Pa. 524, 526, 124 A. 168, the court said: "To be an accident, within the workmen's compensation law, the injury must usually result from some undesigned event occurring at a particular time." In *Gausman v. R. T. Pearson Co.,* 284 Pa. 348, 354, 131 A. 247, the court said: "To constitute an accident there must be some untoward occurrence aside from the usual course of events." In *Adamchick v. Wyoming Valley Collieries Co.,* 332 Pa. 401, 3 A. 2d 377, and *Harring v. Glen Alden Coal Co.,* 332 Pa. 410, 3 A. 2d 381, the court held: "—an accident cannot be inferred merely from an injury. There must be some evidence of an accident, either direct or circumstantial, in the latter instance, clearly and logically indicating it ...... Nor can an injury be inferred simply because there was an accident. There must be proof that the injury resulted from an accident."

Bella Good, the claimant and widow of deceased, testified that deceased was engaged by the Department of Property & Supplies as a steam fitter and had been so engaged for about one year. As to her husband's physical condition on the morning in question, claimant testified that he was well. On cross-examination,

she testified that deceased was 59 years of age and had not been treated for any ailment prior to December 29th, except for ordinary colds.

C. S. Morris testified that he was employed by Property & Supplies at the State Hospital. The witness had worked with deceased for about three years prior to the date in question, but only for about three months continuously. He knew nothing of the alleged accident. He observed, however, that " 'Goody' was down," and his appearance was "very bad; unconscious." He testified that he saw deceased with his head slumped forward on his chest. The time was between 2:00 and 3:00 P. M.

When asked to describe the work that deceased was engaged in on December 29th, the witness testified as follows: "Q. Will you describe more in detail, Mr. Morris, just what was necessary in that line of work? A. Fittings, nipples, and pipe hangers. Q. And is that all you saw him do? A. Working? Q. Yes. A. Yes, sir. Q. When did you last see him do this work; about what hour? A. About — well, it was past two o'clock."

On cross-examination, this witness testified that deceased, when seen, was sitting on top of a pile of wood, with his head bent over and his feet touching the cement bottom. On questioning by the referee, he stated that deceased was a good workman and that his physical condition, from what he was able to observe, was very good.

William Thompson testified that he was employed by the W.P.A., and was assigned to the Harrisburg State Hospital. His testimony was taken at the Harrisburg Hospital, where he was confined, and while seriously ill. With regard to what happened on the day in question, this witness testified: "A. At the time Mr. Good got sick, I was in the store house, and Mr. Good came in there to get some couplings. There was a lard can, and he tried to load the couplings up on his back, and

he started to stagger, and I said, 'Come on, Goody, if you can't do it, I will. Get the hell out of there.' Just acting the fool, you know. I walked ahead, I venture to say seventy-five feet, as near as I can tell. He goes in with this can quick, and I seen when he had the can on him I looked back and I said 'Come on, come on.' And the sweat started to come out on him, and he was as white as a ghost. Down goes the bucket and him. I said, 'Good God, man!' He was sitting on a pile of boards, his fingers clutched and cracking."

He testified that the deceased had steam couplings in the can in question. He estimated the weight as around one hundred pounds. When asked whether he had seen deceased carrying weights as much as one hundred pounds before that day, he stated: "A. Well, naturally, I never took much notice of that. That was out of my line of work. He had helpers. Little fellow called Bobby. But at this time he thought he could make it himself, and signed up for them, and hung the slip on the wall."

With reference to the effect of the lifting of the can of couplings, this witness further testified: "A. When he got that can up, lifted that can up, he staggered. He had it on his knee, and then he shoved it up on top, and the sweat started to pour out of him, and when he got down that far, he couldn't go any farther, and Mr. Lawrence, the General Foreman, came around, and said, 'Where is Good?' I said, 'I don't know.' He looked in, and said, 'Why, here he is.' He was sitting unconscious."

When asked how many minutes had transpired from the time deceased became ill and the time he had lifted the can of couplings, the witness stated that deceased had walked pretty fast and had walked from 75 to 100 feet. When asked whether the can of couplings fell or whether deceased had set the can down, the witness testified: "A. That is a question. I believe that he seen

himself slip, I believe he gave a help with it, and it upset, or it would have upset, you know. He seen he couldn't make it."

On cross-examination, this witness said that he used to see deceased carrying couplings on wires, according to what he needed. He further stated that when deceased had picked up the can of couplings, he, the witness, walked ahead, "and all of a sudden I looked back and looked around, and he was down, unconscious." He further stated that the can of couplings was sitting in an upright position.

William Lawrence, a witness for defendant, testified that he was employed by the W.P.A., and was working at the Harrisburg State Hospital. He was a supervisor of labor, and, in his official capacity, observed the work that deceased was doing. The duties of the witness brought him in contact with deceased every ten or fifteen minutes of the day. As to the occurrence on December 29th, this witness testified: "A. I had met Mr. Good carrying a bucket with—I call it fittings—it is couplings and different other stuff that steam fitters use; the bucket was about a 12 quart bucket; it was full of fittings. He went by, and I said, 'Pretty heavy bucket, Mr. Good' and he just smiled and went by."

This witness stated that, at that time, deceased looked the same as he had before. He also stated that he did not see witness Thompson at that time, although Thompson came to the scene shortly afterward. Mr. Thompson was about forty to fifty feet away from the point where the witness passed deceased. This witness returned within ten minutes after having seen deceased and found him sitting back in the corner on a pile of lumber. He walked past deceased about five or ten feet, "thinking it was one of the W.P.A. employees killing time." It was after this, and after discovering that deceased was ill, that the witness called for help and Mr. Thompson and another laborer answered the

call. The bucket of couplings was five to ten feet away from deceased, "out in a small alleyway". The bucket was sitting full of fittings and was not spilled. This witness estimated the weight of the bucket to be 60 to 75 pounds. The witness lifted the bucket himself. Mr. Lawrence testified that he saw deceased from forty to fifty times a day, sometimes sixty, and testified as follows, as to the nature of the work which deceased was engaged in: "Q. Did you ever observe him carrying heavy weights before December 29, 1937? A. A steam fitter has lifting. You know they have pipes, and other work they have there, yes. Q. You saw him lifting steam fittings, and what else? A. Helped on pipe. There was two men working together on pipe; different fittings and stuff like that; yes. See, they are putting a whole steam fitting system up there, and radiators— the laborers would help to get them down. Q. Well, how would you say that those weights compared with the weight of this pail of fittings? A. I would say that he lifted the same amount of weight. Q. On many occasions? A. Oh, yes. Q. Mr. Lawrence, do you know if it was Mr. Good's regular job to get and carry pipe fittings? A. Oh, yes, sir; that was his job; they had no helper."

On cross-examination by the referee: "Q. Mr. Lawrence, are you testifying now to what you actually have seen, or what his job was? A. What I saw. I was in contact with him 50 or 60 times a day."

This witness further testified that it was ten or fifteen minutes after he had seen deceased when he found him sitting on the lumber. The point where he found deceased sitting was about 25 to 40 feet from the point where he had seen him carrying the bucket.

Based on this testimony the board stated: "Without regard to whether or not the decedent may have on occasions performed the same act before, the exertion in getting the heavy load to his shoulder in view of its untoward result constituted the accident. The author-

ity for this is *Witt v. Witt's Food Market* (122 Pa. Superior Ct. 557) as cited and classified in *Crispin v. Leedom & Worrall Co.* (142 Pa. Superior Ct. 1). Both of these cases are nearly identical in their essential facts with the case before us."

We may assume, therefore, from what the board has stated with regard to the work done, and from all of the evidence in the record, that deceased, at the time of his collapse, was engaged in performing his usual work in a usual manner. Such circumstances do not constitute overexertion. *McFadden v. Lehigh Navigation Coal Co.*, 111 Pa. Superior Ct. 501, 170 A. 314; *Miller v. Lycoming Manufacturing Co.*, 135 Pa. Superior Ct. 558, 7 A. 22.

In the McFadden case, supra, the court stated: "Overexertion is to be taken in a limited sense and as used in the cases referred to does not include such exertion as has been usually performed by the particular employee as a part of his labors. (p. 507) ...... our first conclusion is that hard labor, when labor of the same kind and intensity has been regularly and usually performed by the employee, is not of itself an accident. (p. 504)"

The medical testimony was as follows: Dr. Paul Petree testified he was employed by the Harrisburg State Hospital on December 29, 1937. He was called to examine the deceased and gave him what he termed a "superficial examination or cursory examination." He found deceased sitting up on a lumber pile in a semi-flexed position, moaning and groaning. It was difficult to understand what he was saying. He seemed to be in pain, he was pale, cold, slightly clammy, respirations were labored, pulse increased but of fair quality and regular. The doctor stated that he saw the bucket in question, which was ten or fifteen feet from where deceased was sitting, to the left and forward. The doctor lifted the bucket of couplings and estimated the weight as between 60 to 75 pounds.

Dr. W. D. Hawkins, a witness for the claimant, examined deceased on December 29th, about 4:00 or 4:30 P. M., at the Polyclinic Hospital. At the time he saw deceased, the latter was in a conscious state. Deceased conversed rather intelligently, but with difficulty. He received a history to the effect that he had been lifting a box of nuts and bolts and had become weak and fallen over. The deceased complained to him of sharp stabbing pains, in the chest, right over the breast bone, which radiated to the left arm. On examination the doctor found deceased to be in extreme shock; he was cold, his skin was clammy; he was breathing very rapidly, his pulse almost imperceptible. On examination of the heart, the heart sounds were very distant. A diagnosis of coronary occlusion was made, and deceased was treated for it. This finding was confirmed the next day, when his condition was slightly improved. Deceased remained in the hospital until the time of his death on January 4th. He was under this doctor's care until January 1st, when he came under the care of Dr. John A. Fritchey.

The doctor's conclusion was that deceased died of a coronary occlusion. When asked as to what caused this coronary occlusion the doctor stated: "A. Well, the question of injury, or of coronary occlusion occurring in the manner in which his did, has always been the subject of discussion among physicians; and it was my opinion that the extra strain that occurred lifting that weight that he did caused the occlusion at that particular time that it occurred."

The doctor was asked whether his opinion would change if he knew that deceased had lifted a bucket weighing from 60 to 100 pounds, and he stated: "A. No, I don't think it would. There was probably a disposition there. Every man at his age has a certain amount of arteriosclerosis, or hardening of the arteries, the common term for it; and, when an extra strain is

thrown on an already damaged artery it comes to the point where it can't stand any more and simply gives way; then the damage is done."

The doctor described a coronary occlusion as "An interference of the normal blood supply through a coronary artery, by rupture of the artery; by a foreign body plugging in the artery, which we call an embolus; or, by the blood clotting within the artery, which we call thrombosis; and that interferes to a certain extent with the blood supply of a certain portion of the heart muscle, which we term or call an infarct." It was the doctor's further opinion that deceased was suffering from arteriosclerosis, although not too advanced for a man of his age.

In speaking of the strain incident to the lifting of the bucket of couplings, the doctor stated: "A. I don't know that it was an extra strain for him, but it was the strain that caused the blowout at that particular time. I don't think, if the man had lifted something less heavy, it would have happened. At least he got to the limit of his tolerance. His arteries would stand so much strain. I heard the testimony that he had lifted it to his shoulder. That is the hardest type of exercise or likely to cause the most severe amount of strain on the heart. A man can lift just something light, but the extra strain of pushing it higher than a normal lift, that would be extra strain thrown on the heart.

"Q. Well, then, Doctor, assuming that this man on a number of occasions lifted a similar bucket of fittings to his shoulder, this would have occurred or might have occurred at any one of those times?

"A. That's right; might have occurred at any one of those times."

And again, the doctor states:

"A. That's right; it wouldn't make any difference, because every time he lifted it there was more strain thrown on that particular part of his body, and it comes

to the point where it wouldn't stand any more strain, and then you have the trouble."

The above is the extent of the medical testimony introduced by claimant. This testimony does not show an injury to the physical structure of the body which was untoward or unexpected. Deceased was suffering from arteriosclerosis. Death was caused as a natural result of this disease. Doctor Hawkins stated that continual strain on the heart reaches a point where the heart is unable to stand further strain and then the damage is done. According to Dr. Petree, the extra strain thrown on an already damaged artery causes the damage.

The defendant introduced the testimony of Dr. C. P. Faller, who agreed in the diagnosis given by Dr. Hawkins, to wit: coronary thrombosis with myocardial infarct, and stated as follows, regarding the disease in question: "A. Coronary thrombosis is a complication of and a result of coronary sclerosis. Coronary sclerosis is a very slow and progressive disease, where the arteries of the heart are hardened, where the lumen, or channel is encroached upon and where the flow of blood through these hardened arteries is impeded. There can be no coronary thrombosis without coronary sclerosis."

Dr. Faller makes the following statement with regard to causal relationship between the lifting and the attack: "A. Remembering the progressive pathology involved here in the production of coronary thrombosis, I would say that the lifting of this weight, or any effort, had nothing whatsoever to do with the attack, causation of the attack."

In the absence of proof of an accident, the medical testimony with regard to cause and effect can be of little support in determining whether the claim is compensable. *O'Neill v. Lehigh Valley Coal & Navigation Co.*, 108 Pa. Superior Ct. 425, 165 A. 60; *Rocco v. Ellsworth Collieries Co. et al.*, 111 Pa. Superior Ct. 508,

170 A. 316; *Fetrow v. Oliver Farm Equipment Sales Co. et al.,* 132 Pa. Superior Ct. 39, 1 A. 2d 249. In the O'Neill case, supra, the court said: "We are not concerned about the opinion of medical experts, relative to causal connections, in this, or in any, compensation case until we have first found direct or circumstantial evidence of an accident."

The record lacks direct or circumstantial evidence of the occurrence of an accident. Since the work that deceased was engaged in was work which he had been engaged in for some time previous thereto, although the work could be classed as heavy work, that, in itself, does not constitute an accident. The nature of the damage done to the physical structure of the body was such as naturally followed the existence of arteriosclerosis, and therefore cannot be classed as accidental.

The line of demarcation between cases which are compensable and those not compensable is very often determined by a consideration of the claimant's condition at the time of the onset of disability. If the disability is due to the natural progress of a disease from which claimant is suffering, without more, it is not compensable. *Gausman v. R. T. Pearson Co.,* 284 Pa. 348, 131 A. 247; *Amentlar v. New Upper Lehigh Coal Co.,* 131 Pa. Superior Ct. 97, 198 A. 678; *Fetrow v. Oliver Farm Equipment Sales Co.,* supra.

If, however, the disability is due to a mishap or fortuitous happening, an untoward event which is not expected or designed, it is compensable, even though the claimant may, at the time, have been suffering from a pre-existing condition. *Melini v. Saltsburg Coal Mining Co. et al.,* 119 Pa. Superior Ct. 356 (1935) 181 A. 330.

In the case of *Fetrow v. Oliver Farm Equipment Sales Co.,* supra, the deceased, while engaged in his usual and regular occupation of loading, unloading and setting up farm machinery, weighing from 400 to 500

pounds, after having moved the machinery about four feet, doubled over in pain and grabbed his chest. About fifteen minutes after the attack, he was taken to the hospital, where he was found to be extremely ill and crying out with pain in his chest, which radiated down his left arm. He was extremely short of breath and his skin was covered with a cold, clammy perspiration. A diagnosis was made of acute coronary thrombosis. The deceased was suffering from a chronic ailment, a disease of his coronary vessels. Compensation was disallowed on the theory that deceased did not die as a result of an accident, even though the doctor who testified on behalf of the claimant, stated that the coronary thrombosis resulted from the strain incident to moving the machinery. As to this, the court held there was no evidence of the strain which the doctor assumed to exist.

The symptoms suffered by deceased in the instant case are similar to those suffered by deceased in the Fetrow case. The disease from which each suffered was a disease of the coronary vessels. The cause of death in each case was the same. The work that the deceased did in the Fetrow case was by far more strenuous than the work that the deceased did in the instant case.

In *Crispin v. Leedom & Worrall Co. et al.,* 142 Pa. Superior Ct. 1, 15 A. 2d 549, the evidence disclosed that the claimant assisted in loading a truck weighing about 1800 pounds, taking it up in an electric elevator and pushing the truck off the elevator. Because of the weight of the truck and its contents, the elevator stopped an inch to an inch and one-half below the level of the storeroom where the goods were to be placed. It was in his attempt, together with a fellow employe, to push the truck over this elevation, that the claimant suffered the heart strain from which he became disabled. The evidence disclosed that the elevator frequently stopped within an inch to an inch and one-half below the floor level. It was therefore conceded that claimant was

not doing anything different on that day from what he had done on other days. Although this court affirmed an award, on the theory that the heart strain constituted the accident, the Supreme Court reversed this court in 341 Pa. 325, 19 A. 2d 400, which held that claimant's disability was not the result of an accident and stated: "In *Adamchick v. Wyoming Valley Collieries Co.*, 332 Pa. 401, 3 A. 2d 377, we pointed out that to establish a right to compensation it must be shown that the claimant met with an *accident* in the course of his employment, reiterating what we had theretofore declared in *Gausman v. Pearson Co.*, 284 Pa. 348, 354, 131 A. 247; 'Disability, overtaking an employee at his work, is not compensable unless the result of accident.' Summarizing our judgment in the Adamchick case, we said (p. 410) : 'After giving careful consideration to the provisions of the Workmen's Compensation Act, the policy which underlies it, our own decisions and those of the Superior Court, not all of which seem to be in full harmony, our conclusion is that to secure compensation there must be proof *both* of an accident and of an injury; an accident cannot be inferred merely from an injury. There must be some evidence of an accident, either direct or circumstantial, in the latter instance clearly and logically indicating it. In this case, there was none. Nor can an injury be inferred simply because there was an accident. There must be proof that the injury resulted from an accident.' "

"It need only be remarked that while an accident is necessarily something unusual, it does not follow that every unusual occurrence, or deviation from the usual manner of performing the work, amounts to an accident." *Ferraro v. Pittsburgh Terminal Coal Corp.*, 142 Pa. Superior Ct. 22, 15 A. 2d 559.

We are of the opinion that appellee has failed to sustain the burden of proof that her husband died as the result of an accident to warrant a recovery.

Judgment reversed and now entered for defendant.